U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 FEB 21　PM 4: 53

CLERK

BY␣␣␣␣␣␣␣␣[signature]
　　　DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DONALD SCOTT BERTRAM,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　Case No. 2:17-cv-00033
　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL,　　　　　　　)
Acting Commissioner of Social Security,　)
　　　　　　　　　　　　　　　　　)
　　　Defendant.　　　　　　　　　)

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM

(Docs. 5 & 6)

Plaintiff Donald Scott Bertram is a claimant for Social Security Disability

Insurance Benefits ("DIB") under the Social Security Act ("SSA"). He brings this action

pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security

Commissioner that he is not disabled. On July 7, 2017, Plaintiff filed his motion to

reverse and remand for the calculation of benefits (Doc. 5), and the Commissioner filed

her motion to affirm on August 17, 2017 (Doc. 6). Plaintiff replied on September 1, 2017

at which point the court took the pending motions under advisement.

Plaintiff is represented by Judith Brownlow, Esq. The Commissioner is

represented by Special Assistant United States Attorney James P. Peck.

Plaintiff raises the following issues on appeal: (1) whether Administrative Law

Judge ("ALJ") Matthew Levin erred by failing to follow the remand Order; (2) whether

ALJ Levin violated the treating physician rule; (3) whether the ALJ improperly weighed

the opinions of examining medical experts and state agency consultants; (4) whether ALJ

Levin erred in determining Plaintiff's residual functional capacity ("RFC"); and

(5) whether ALJ Levin erred in finding Plaintiff's alleged symptoms inconsistent with the

medical evidence.

## I.  Procedural History.

On December 21, 2009, Plaintiff filed for DIB benefits, alleging that he was disabled as of August 1, 2009. The Commissioner denied his application initially and on reconsideration. On October 14, 2011, Plaintiff testified at a hearing before ALJ Thomas Merrill. Plaintiff's wife, Joni Bertram, and a vocational expert ("VE") also testified. After the hearing, Plaintiff amended his alleged disability onset date to January 1, 2008. On November 16, 2011, ALJ Merrill issued a decision finding Plaintiff was not disabled. After granting review of Plaintiff's application on January 18, 2013, the Appeals Council vacated and remanded the case, finding the ALJ improperly determined that Plaintiff's work activity constituted substantial gainful employment under the tests articulated in 20 C.F.R. § 404.1575(a)(2).

On July 13, 2013, a second hearing was held before ALJ Merrill with Plaintiff and a VE testifying. ALJ Merrill issued a second decision denying Plaintiff's application on September 24, 2013 and the Appeals Council denied Plaintiff's request for review.

On May 28, 2014, Plaintiff appealed to this court, which reversed and remanded the Commissioner's decision, holding the ALJ improperly evaluated self-employment income in determining whether Plaintiff engaged in substantial gainful activity and erred in his analysis of the medical opinions. Although it did not reach the issue, the court further noted that the ALJ appeared to have improperly evaluated Plaintiff's credibility by selecting facts from the record depicting Plaintiff as engaging in a more active lifestyle than indicated by the record as a whole. On September 11, 2015, the Appeals Council issued an Order of Remand.

A third hearing took place before ALJ Levin on September 20, 2016. The ALJ denied Plaintiff's application on December 7, 2016, and the Appeals Council denied Plaintiff's request for review. As a result, ALJ Levin's decision stands as the Commissioner's final decision.

## II.  Factual Background.

Plaintiff is a fifty-five year old man who is married with two adult children. At the time of his alleged disability onset date of January 1, 2008, he was forty-five years

2

old. He has a high school education and attended college for approximately one year. Plaintiff has previous work experience in real estate and as a self-employed property caretaker and snowplow operator. He also occasionally assisted his wife with her cottage-rental business.

## A.    Plaintiff's Medical History.

Plaintiff alleges disability from degenerative disc disease causing back pain that radiates down his left leg, degenerative joint disease in his right knee, bilateral carpel tunnel syndrome ("CTS") with pain and numbness in his hands and wrists, depression, and anxiety. His medical records reveal that he has had inguinal hernias with multiple repairs and suffers from blurred vision.

### 1.    Plaintiff's History of Lower Back Pain.

In 1993, Plaintiff ruptured a disk in his back while working. Surgery partially relieved his back pain, allowing him to return to work until 2001 when he re-injured his back. After a second surgery, Plaintiff returned to full-time work, although intensifying back pain reduced him to part-time work in the spring of 2004. An MRI revealed post-operative changes at L4-L5 of the spine with no clear recurrent disc herniation. From September 13, 2004 to October 7, 2004, he attended the Functional Restoration Program ("FRP") at Dartmouth Hitchcock Medical Center. On September 24, 2004, Plaintiff stated that he was unable to shovel snow and had significant difficulty sitting, walking, and lifting. However, on January 18, 2005, Plaintiff reported that he had reduced his pain and increased his stamina during the FRP. During a follow-up visit on January 18, 2005, Plaintiff described his pain as "mild" and "stable" with the "related disability . . . as nil." (AR 820.) At his 2011 hearing, Plaintiff testified that he was unable to return to full time work after completing FRP.

### 2.    Plaintiff's Treatment History with Psychiatrist Ray Abney.

In 2009, Plaintiff's primary care physician referred him to Ray Abney, M.D. a psychiatrist affiliated with Springfield Hospital in Springfield, Vermont, for treatment for depression. Dr. Abney first interviewed Plaintiff on December 18, 2009 and has seen him approximately once per month through August 10, 2016. Initially, Dr. Abney

3

diagnosed Plaintiff with major depressive disorder, single episode, moderate, caused at least in part by "chronic back pain" and prescribed him Zoloft and Wellbutrin. (AR 665.)

Dr. Abney's treatment notes from December 18, 2009 to April 25, 2011 generally show a lack of improvement in or worsening of Plaintiff's depression. On July 6, 2010, Plaintiff stated that he was "not feeling as good as before" and had "feelings of I don't care[.]" (AR 668.) During an August 2, 2010 appointment, Plaintiff informed Dr. Abney that he stays home when his family "goes places and does things" and that he is "[g]etting by, but barely." (AR 910.) On October 5, 2010, Plaintiff related that he "[h]asn't enjoyed things for 7 years [and] hasn't enjoyed his motorcycle for 2+ years" and that he "[f]eels down . . . [and] useless." (AR 702.)

Based on his treatment of Plaintiff, Dr. Abney opined on August 27, 2010 that Plaintiff was "totally disabled" and "[u]nless his back pain" is reduced, "he will be unable to return to work." (AR 661.) On January 5, 2012, Dr. Abney assigned Plaintiff a GAF score of 50, indicating serious symptoms.[1] In Dr. Abney's view, although Plaintiff's symptoms improved after changing medications, these "benefit[s] fade[] over time." *Id.* Relying in part on Plaintiff's self-reported symptoms, Dr. Abney indicated that Plaintiff has "[m]arked restriction of activities of daily living"; "[m]arked difficulties with maintaining social functioning"; "significant to marked decrease in concentration, persistence[,] and pace" and; "[r]epeated decompensation into depression but not to the extent of hospitalization." (AR 912.) In explaining his opinions, Dr. Abney found that "[Plaintiff's] life has totally changed" due to depression as he "rarely goes anywhere or

---

[1] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereafter "DSM-IV")). GAF scores rate the overall psychological functioning of an individual on a scale of zero to 100, *see Scott v. Colvin*, 2016 WL 5173252, at *6 (E.D.N.Y. Sept. 21, 2016) (citing DSM-IV (text revision) at 34), and are assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning. *See Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, at *12 (S.D.N.Y. Jan. 23, 2015). "[T]he utility of [a GAF score] is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Berry v. Comm'r of Soc. Sec.*, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015).

4

does anything he used to enjoy[,]" that he "[s]pends little to no time with friends on his own" and "only goes out [with] strong pressure from [his] wife or family[,]" and that "[a]lthough he can do things physically he has to always be on guard or he'll end up bedridden the next day from pain." *Id.* Dr. Abney further opined that "[t]he extent and persistence of his depression is quite pervasive and affects most aspects of [Plaintiff's] life" and that his treatment notes "do not clearly express [Plaintiff's] sense of desperation and hopelessness." *Id.*

On November 28, 2011, Plaintiff reported that he planned to allow his real estate license to expire because he "can't do the sitting" required for the job. (AR 1443.) While a September 14, 2011 appointment documents that Plaintiff was able to paint a house, he reported the activity left him "in bed 3 days after that." *Id.* During several sessions with Dr. Abney, Plaintiff described his holiday plans which included attending parties with friends and going to see a movie. At a July 16, 2012 appointment, Plaintiff stated that he had better energy and was capable of walking a mile. During an August 13, 2012 treatment session with Dr. Abney, Plaintiff described a trip to Niagara Falls for which he did most of the driving. He described planning a vacation to Hilton Head, South Carolina at a June 24, 2015 visit.

On July 10, 2013, Dr. Abney opined:

[A]lthough [he] can at time give [Plaintiff] some relief with medications and therapy, his relief is short[-]lived because he remains limited by physical pain . . . and this damages any improvement in mood or self[-] esteem . . . Unless some new treatment becomes available to fix his disc disease and pain, so he can work steadily, I believe he'll remain trapped in depression and pain.

(AR 913.)

On April 7, 2014, Plaintiff stated that he "[f]inished a shed[.]" (AR 1432.) He described attending a family member's wedding in Houston, Texas. For Plaintiff's travel to and from Houston, Dr. Abney stated that "[Plaintiff will] want a "tranq[uilizer] before flying." *Id.* Before a June 23, 2014 appointment, Dr. Abney found Plaintiff "[s]lowly

5

walking" in the waiting room because it "hurts too much to sit[.]" (AR 1431) (internal quotation marks omitted).

In 2015 and 2016, Plaintiff described his property maintenance business to Dr. Abney, reporting that while his wife did most of the physical work for the business, he helped with plowing, which afterwards left him "hurt[] all over and [feeling] exhausted[.]" (AR 1429.) On April 13, 2016, he expressed a desire to do work around the house, but if he "mow[s] for 3 [hours], [he] can't work later." (AR 1424.)

Most recently, in August 10, 2016, Dr. Abney noted that Plaintiff "doesn't do repetitive things at work" and that "spotty work [and] activity" leaves him unable to "do much." (AR 1423.) During the same appointment, however, Plaintiff described "a motor cycle ride [with] his wife" and complained that "his wife won't get him [his] own bike." *Id.* On April 11, 2016, Dr. Abney stated that his opinion "ha[d] not changed" and that he "continue[d] to feel [that Plaintiff] is severely impaired and unable to work because of his depression and chronic back pain." (AR 1404.)

### 3. Plaintiff's Treatment History with Primary Care Physician Robert Tortolani.

In April 1994, Robert Tortolani, M.D. became Plaintiff's primary care physician, treating him for chronic pain and depression, among other conditions. On June 16, 2009, Dr. Tortolani identified Plaintiff's health issues as: depression with suicidal thoughts; decreased concentration; poor sleep; and low energy; and a positive Phalen's test for carpel tunnel syndrome with tenderness and numbness in his hands. Plaintiff complained that joint pain in his knee left him worn out and prevented him from working. Although he denied suicidal ideation, Plaintiff told Dr. Tortolani that he felt "like [he was] at the end of [his] rope." (AR 591) (internal quotation marks omitted). During a June 16, 2009 appointment, Dr. Tortolani noted that Plaintiff had "not had a happy day [in] months" and that he has had numbness in his hands for a year due to CTS. (AR 593.) On December 7, 2009, Plaintiff stated that he was "worn out" by his joint pain, which prevented him from working. (AR 591) (internal quotation marks omitted).

6

At several appointments, however, Dr. Tortolani noted that Plaintiff reported generally feeling well. For example, during a 2008 appointment, Plaintiff stated that he was doing well, happy with his work, and developing a client base for his property maintenance business. Plaintiff stated that he felt "better" and Dr. Tortolani noted that he "looks profoundly better" during a December 17, 2009 visit. (AR 589.) On May 5, 2011, Plaintiff described his pain as "reasonable[,]" that taking Aleve and ibuprofen "seem[ed] to help[,]" and that he was "happy to be mowing today." (AR 842.) Dr. Tortolani recorded that Plaintiff "look[ed] well" and is "generally doing well." *Id.* With regard to Plaintiff's RFC, Dr. Tortolani wrote a one-sentence letter stating that he "read Dr. Huyck's report and [he] concur[red] with her assessment." (AR 897.)

## 4. Consultative Examinations by Mr. Italia, Dr. Huyck, and Dr. Donaldson.

On February 22, 2010, Plaintiff completed a psychological evaluation with licensed psychologist Michael A. Italia, M.A. During the examination, Plaintiff described his part-time self-employment in property maintenance, which involved snow plowing and lawn mowing. He further related that he was capable of "complet[ing] chores around the home" and perform "self-care without difficulty." (AR 611.) In terms of psychological symptoms, Plaintiff stated that his mood was depressed, with low motivation and self-esteem and that he had difficulty concentrating. Although he had passing thoughts of suicide, he had no plans to act and did not believe he would do so. In Plaintiff's view, his depression correlated with his physical symptoms. Plaintiff reported that medications helped to reduce the symptoms.

Mr. Italia observed that Plaintiff's symptoms of depression and anxiety were readily apparent. Throughout the interview, Mr. Italia found that Plaintiff was polite, friendly, and cooperative in providing information about his mental and physical health.

Mr. Italia diagnosed Plaintiff with major depressive disorder, recurrent, moderate and generalized anxiety disorder and assigned him a GAF score of 55 to 60, indicating mild to moderate symptoms. In assessing Plaintiff's RFC, Mr. Italia opined that Plaintiff's "ability to understand instructions should be good." (AR 612.) He concluded

7

that Plaintiff may have problems concentrating and carrying out instructions, as well as coping with the stressors of the work environment, due to his mental health symptoms. Nonetheless, Mr. Italia found Plaintiff capable of interacting appropriately with supervisors and co-workers. Although Mr. Italia did not review Plaintiff's physical limitations, he noted that Plaintiff "seemed to tolerate the hour plus session today without overt exhibition of pain from the sitting." *Id.*

On March 22, 2010, state agency consultant Ronald Woodworth, D.O. examined Plaintiff at his office in Bennington, Vermont. Plaintiff complained of pain mostly in his lower back and left leg. However, Plaintiff reported that "he [was] able to touch the floor with his fingertips, [although] there is pain at that point." (AR 622.) During the exam, Plaintiff had "fairly good heel and toe walking with some slight weakness in his left leg." *Id.* He had good range of motion in his neck. Dr. Woodworth concluded that Plaintiff had "probable degenerative joint disease" in the lower back and was "positive [for CTS] on the left side" according to the compression test. *Id.*

Seeking a work capacity evaluation for his back pain, on September 18, 2011 and July 25, 2016, Plaintiff met with Karen Huyck, M.D., an occupational and environmental medicine specialist at Dartmouth Hitchcock Medical Center. Dr. Huyck concluded that Plaintiff's spine condition met Listing 1.04 for disorders of the spine, finding his lower back pain and left lower extremity pain consistent with left L5 radiculopathy and complicated by CTS, right knee pain, and depression. Because Plaintiff "had expert and appropriate care for his recurrent disc herniations[,]" received extensive treatment, and exhausted conservative care, Dr. Huyck found Plaintiff's conditions "chronic" and opined that he "is not expected to improve in any significant way in the next 12 months[.]" (AR 885.) She further opined that Plaintiff "is unable to tolerate more than eight hours of work per week that are completely flexible as to when they are scheduled[.]" (AR 898.)

Dr. Huyck's 2011 RFC exam showed a sitting tolerance of thirty minutes and a dynamic standing tolerance of thirty-three minutes. A Crawford Small Parts Test indicated that Plaintiff's "fine motor coordination [was] below the [first] percentile with tremor noted in [Plaintiff's] bilateral hands such that he would not be able to do frequent

8

fine-motor tasks in a work position." (AR 898.) Plaintiff was capable of climbing fifty-eight stairs, had a "safe lifting tolerance from floor to knuckle [of] 38 pounds, from knuckle to shoulder [of] 43 pounds, overhead [for] 23 pounds, and [a] carrying tolerance for 30 feet [of] 43 pounds." *Id.* Plaintiff could ambulate at "55% of the expected amount for his age and sex." *Id.* Based on this RFC exam, Dr. Huyck concluded Plaintiff would be unable to "sustain any meaningful work-related fine motor tasks necessary for a more sedentary position[.]" (AR 899.)

In her July 2016 RFC exam, Dr. Huyck noted that Plaintiff "is currently working as a property caretaker for 12 to 15 hours a week, light duty, since 1994" but that this level of activity "is getting progressively harder for him" to maintain. (AR 1411.) Dr. Huyck recorded a sitting tolerance of twenty-six minutes, dynamic standing tolerance of thirty-four minutes with fine motor coordination in the twenty-fifth percentile and ambulation at the sixty-eighth percentile for his age group. Plaintiff could lift between thirty-three and forty-eight pounds, carry up to forty-three pounds, and climb forty-eight stairs. Dr. Huyck cautioned that these results were one-time maximum efforts and that Plaintiff would be unable "to sustain this level of activity over an 8[-]hour day" because of "high levels of pain after testing[.]" (AR 1417.) Comparing these results to the 2011 RFC exam, Dr. Huyck found this test showed "improved, but still limited, fine motor coordination." *Id.* Otherwise, Plaintiff "perform[ed] about the same as last testing session." *Id.* Dr. Huyck concluded that Plaintiff "does not have the capacity for manual work" and "does not have the fine motor coordination or sitting tolerance for sedentary work." (AR 1413.)

On November 7, 2011, Plaintiff met with Deirdre H. Donaldson, M.D. for a neurology consultation. In examining Plaintiff's fine motor skills, Dr. Donaldson found that Plaintiff had "no tremor at rest nor postural" although he "did get some non-Parkinsonian tremor of the right hand [while] holding the equivalent of a cell phone to his ear after a while." (AR 915.) There was also no tremor during Romberg testing. Dr. Donaldson noted that Plaintiff's "fine finger movements were good" and that "[s]trength

9

was 5/5 throughout." *Id.* She concluded that Plaintiff had "[p]osition-specific tremor" in his hands but that it "is not interfering with his life and does not require treatment." *Id.*

**B.    State Consultants' Assessments.**

On March 24, 2010, Dr. Farrell completed a mental RFC assessment, reviewing the evidence in the record from August 2009 until August 2010. He checked boxes indicating that Plaintiff was "[n]ot [s]ignificantly [l]imited" in understanding and memory and social interaction. (AR 624-25.) Similarly, he concluded Plaintiff was "[n]ot [s]ignificantly [l]imited" in sustaining concentration and persistence, although he indicated Plaintiff was "[m]oderately [l]imited" in the ability to maintain attention and concentration for extended periods and in "[t]he ability to complete normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* Other than a moderate limitation in responding appropriately to changes in the work setting, Dr. Farrell found Plaintiff not significantly limited in adaptation.

In explaining his conclusions, Dr. Farrell cited Plaintiff's ability to complete household chores and other activities of daily living, such as driving, shopping, and paying bills, along with his part-time work in real estate. Dr. Farrell found Plaintiff's major depression and generalized anxiety disorder could affect his concentration and pace, however, Plaintiff would be able to concentrate for two-hour blocks of time and perform three-plus step low stress work activities. He further noted that Plaintiff was polite and courteous during the examination, interacted well with others, and was capable of planning and setting goals.

The mental RFC assessment conducted by Ellen Atkins, Ph.D. on September 15, 2010, generally reached the same conclusions as Dr. Farrell. Dr. Atkins reviewed Dr. Abney's treatment notes as of the date of her assessment, finding his conclusion that Plaintiff was "totally disabled" inconsistent with his own treatment notes and those of Dr. Tortolani. (AR 673.) She noted the same activities of daily living cited in Dr. Farrell's opinion and cited Dr. Tortolani's treatment notes reporting that Plaintiff felt better and

10

had more energy and Dr. Abney's reports stating that medication ameliorated Plaintiff's depression.

On March 30, 2010, Carl Runge, M.D. completed a physical RFC assessment. Dr. Runge found that Plaintiff could "[o]ccasionally lift and/or carry" twenty pounds and "[f]requently lift and/or carry" ten pounds. (AR 643.) According to Dr. Runge, Plaintiff could "[s]tand and/or walk (with normal breaks)" for "at least 2 hours in an 8-hour workday" and could sit for "about 6 hours in an 8-hour workday[.]" *Id.* He noted no limitations in pushing or pulling. As for postural limitations, Dr. Runge indicated Plaintiff would be "[o]ccasionally" limited in climbing ramps or stairs, stooping, kneeling, crouching, and crawling and "[f]requently" limited in balancing because these actions would aggravate his back and left leg pain. (AR 644.) He cited medical records indicating near normal or normal range of motion and reflexes in the lumbar spine, normal and symmetrical leg strength, and fairly good heel to toe walking.

On September 21, 2010, Geoffrey Knisely, M.D. reached the same conclusions as Dr. Runge on reconsideration of Plaintiff's physical RFC. Additionally, Dr. Knisely referenced the daily activities self-described in Plaintiff's July 2010 Function Report, which included using a computer to check email, "returning calls, paying bills[,]" mowing the lawn, and completing some household chores. (AR 457.)

## C. Plaintiff's Testimony at the October 14, 2011 and September 20, 2016 Hearings.

At the September 20, 2016 hearing before ALJ Levin, Plaintiff testified that there were no changes to his physical limitations since his October 14, 2011 testimony. During this first hearing before ALJ Merrill, Plaintiff described his property maintenance business, which involves "general around the house maintenance[,]" such as painting, mowing, gardening or weeding, plowing, and other home maintenance tasks. (AR 68.) Plaintiff claimed that his ability to complete these manual labor activities had declined due to intensifying pain. Believing that "a desk job would be easier[,]" Plaintiff obtained a real estate license. *Id.* He acknowledged that he was able to work four-hour shifts in a real estate office, although he subsequently discovered that his pain prevented him from

11

sitting for extended periods of time as required for this type of work. Consequently, Plaintiff let his real estate license expire and continued to work part-time with his property maintenance business. On days when Plaintiff worked, he described mowing lawns for two-and-a-half hours during the summer and spring and plowing for three-and-a-half to four hours during the winter.

During the first hearing, Plaintiff testified to the limitations caused by his pain. He stated that the sciatic pain in his left leg is so intense that it affected his ability to concentrate on tasks. He found that "[p]retty much any movement, work, [or] play activity . . . irritates the nerve [in his back] and the scar tissue[,] caus[ing] the swelling and the pain increases." (AR 70.) He testified that he had difficulty sitting for more than two hours. Regarding his CTS diagnosis, Plaintiff described shaking and tremors in his hands and numbness in his wrists. Overall, he reported that the pain prevents him from working approximately two days per week. Plaintiff stated that he had not worked an eight-hour day since 2009.

Describing his average day, Plaintiff testified that he wakes up in pain having slept poorly. He requires "about two hours kind of walking around the house or sitting in the chair [to] . . . generally loosen up." (AR 71.) He reported doing some stretches, exercises, and lying on his back every day to manage his symptoms. After this morning routine, Plaintiff decides whether he is capable of sitting at his desk "for an hour or two" (AR 71-72) or trying to mow a lawn for two hours. He testified that he works a couple of hours per day until his pain increases to the point where it is too uncomfortable to continue. He stated that he runs personal errands such as driving to the bank, performs kitchen work such as emptying the dishwasher, and walks the dogs.

During the September 20, 2016 hearing before ALJ Levin, Plaintiff estimated that he works eight to ten hours a week, but that he is unable to work at all two days per week and up to eight days per month. Plaintiff testified that his work schedule is limited "because [his] leg [hurts] so bad[ly] that [he] can't do anything else, . . . or [he] feel[s] so depressed [he] can't get out of the house." (AR 972.) For at least the last ten years, Plaintiff drove and engaged in snow plowing, while his wife handled the snow shoveling.

12

When plowing snow, Plaintiff stated that he sits in the truck during the route, which lasts on average between three-and-a-half and four hours, but that he has "to stop a few times and get around and walk and stretch." (AR 974.) Plaintiff testified that he answers phone calls and occasionally types with one finger, but his wife does all of the bookkeeping, billing, accounting, and picking up of supplies for the business.

Regarding his daily activities, Plaintiff stated that he has trouble getting his shoes tied. While he is able to go shopping with his wife, he "use[s] the shopping cart for support" when walking. (AR 980.) Outside of occasional family birthdays, Plaintiff testified that he has no social life.

To manage his wrist and knee pain, Plaintiff testified that he wears knee and wrist braces. For his depression, Plaintiff takes Abilify, Bupropion, and Seroquel as prescribed by Dr. Abney. When asked by ALJ Levin, Plaintiff confirmed that he had received no treatment for his back in the last three or four years, but that he does not raise the issue with his doctors because they told him that the pain was caused by scar tissue pressing on a nerve and that there "wasn't anything they could do for it at this point." (AR 968.)

## III. ALJ Levin's December 12, 2016 Decision.

In order to receive disability benefits under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation process determines whether a claimant is disabled:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden

13

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

On December 12, 2016, ALJ Levin denied Plaintiff's application for benefits. In so ruling, he determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2008. At Step Two, ALJ Levin found the following severe medically determinable impairments: "degenerative disc disease (lumbar spine); degenerative joint disease (right knee); depression and anxiety[.]" (AR 930.) Although Plaintiff "alleged disability in part due to symptoms of numbness and pain in his wrists due to [CTS][,]" ALJ Levin found this impairment "nonsevere" because of limited objective findings from the last seven years, as well as evidence in the record showing CTS minimally limited Plaintiff's work-related activities. *Id.* (internal quotation marks omitted). At Step Three, he concluded that none of Plaintiff's severe impairments, either independently or collectively, met or exceeded one of the listed impairments.

At Step Four, ALJ Levin determined that Plaintiff had the RFC to:

[P]erform light work as defined in 20 CFR [§] 404.1567(b), except with the ability to stand/walk for up to 2 hours and sit for 6 hours in an 8-hour workday. He is able to frequently climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds. He is able to maintain attention and concentration for 2-hour increments throughout an 8-hour workday, and he is able to respond appropriately to changes in the work setting.

(AR 933.)

In analyzing Plaintiff's RFC, ALJ Levin noted that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [Plaintiff's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (AR 935.) Evaluating the reliability of Plaintiff's reports on

14

his RFC, ALJ Levin found that "his testimony is somewhat inconsistent regarding the extent of his work activity during the relevant time period." (AR 937.)

At Step Five, ALJ Levin concluded that Plaintiff is unable to perform any past relevant work, but could perform a significant number of jobs in the national economy such as "sorter/folder of laundry[,]" "price marker[,]" and "recreation attendant[.]" (AR 943.) For these reasons, ALJ Levin found Plaintiff was not disabled from January 1, 2008 to December 12, 2016, the date of his decision.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)) (internal quotation marks omitted). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149. "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

### B. Whether ALJ Levin Violated the Treating Physician Rule.

In arguing that the ALJ violated the remand Order, Plaintiff focuses his challenges on alleged violations of the treating physician rule. Plaintiff contends that ALJ Levin erred as a matter of law by not assigning controlling weight to the opinions of Dr. Abney and Dr. Tortolani because "the SSA recognizes a treating physician rule of deference to

15

the views of the physician who has engaged in the primary treatment of the claimant[.]"
*Burgess*, 537 F.3d at 128 (internal quotation marks omitted).

> Treating source means [the claimant's] own acceptable medical source who
> provides [the claimant], or has provided [the claimant], with medical
> treatment or evaluation and who has, or has had, an ongoing treatment
> relationship with [the claimant]. Generally, we will consider that [the
> claimant has] an ongoing treatment relationship with an acceptable medical
> source when the medical evidence establishes that [the claimant] see[s], or
> [has] seen, the source with a frequency consistent with accepted medical
> practice for the type of treatment and/or evaluation required for [the
> claimant's] medical condition(s).

20 C.F.R. § 404.1527(a)(2). Treating physicians "are likely . . . most able to provide a
detailed, longitudinal picture of [a claimant's] medical impairment(s)" and they "may
bring a unique perspective to the medical evidence that cannot be obtained from the
objective medical findings alone or from reports of individual examinations, such as
consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

"[T]he opinion of a claimant's treating physician as to the nature and severity of
the impairment is given 'controlling weight' so long as it 'is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in [the] record.'" *Burgess*, 537 F.3d at 128 (alteration in
original) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ does not accord a treating
physician's opinion "controlling weight," he or she is required to give "good reasons" for
the lesser weight assigned. 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 129. "The
requirement of reason-giving exists, in part, to let claimants understand the disposition of
their cases, even—and perhaps especially—when those dispositions are unfavorable."
*Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). "[F]ailure to provide good reasons for
not crediting the opinion of a claimant's treating physician is a ground for remand."
*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

In weighing a medical opinion, the ALJ must consider: (1) the length of the
treatment relationship and the frequency of examination; (2) the nature and extent of the
treatment relationship; (3) the "relevant evidence" provided in support of the opinion,

16

"particularly medical signs and laboratory findings"; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is giving an opinion "about medical issues related to his or her area of specialty"; and (6) any other relevant factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6) (explaining that "[u]nless we give a treating source's medical opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion").

### 1. Whether ALJ Levin Properly Assigned "Little Weight" to Dr. Abney's Opinions.

Plaintiff asserts that ALJ Levin's conclusion that Dr. Abney's opinions were entitled to "little weight" suffers from the same defects this court found in remanding ALJ Merrill's 2013 decision by: (1) ignoring Dr. Abney's status as a treating physician; (2) disregarding Dr. Abney's opinion on an ultimate issue in the case; (3) discounting the reliability of his assessment of Plaintiff's physical pain because of his background as a mental health professional; and (4) ignoring the court's previous finding that Dr. Abney's opinions were consistent with his own treatment notes and the record as a whole.

As a threshold issue, ALJ Levin did not ignore Dr. Abney's status as a treating physician. *See* AR 940 (giving "little weight to the opinion evidence offered by the claimant's treating psychiatrist, Ray Abney, M.D."). The remand Order found that ALJ Merrill "should have given more weight to Dr. Abney's opinions due to his status as a treating physician who treated [Plaintiff] frequently[.]" (AR 1064.) In his decision, however, ALJ Levin acknowledged that Dr. Abney "ha[d] known the [Plaintiff] since December 2009[.]" (AR 940.) Contrary to Plaintiff's assertion, the ALJ did not fail to follow the remand Order to consider Dr. Abney's treating physician status.

In support of his claim that ALJ Levin erred in discounting Dr. Abney's August 28, 2010 opinion that Plaintiff was "totally disabled" (AR 661), Plaintiff points to the remand Order, which states that, although the issue of whether Plaintiff was disabled is reserved to the Commissioner, "it does not follow that the Commissioner was free to disregard Dr. Abney's opinions entirely." (AR 1065.) ALJ Levin, however, did not

17

violate the remand Order by noting that Dr. Abney's conclusion that Plaintiff was "totally disabled" was a "conclusory statement made in a short letter[.]" (AR 940.) This was factually accurate and legally proper. He then proceeded to explain why he gave Dr. Abney's RFC opinions "little weight." No error thus lies in ALJ Levin's failure to find Dr. Abney's disability determination dispositive.

Plaintiff next argues that ALJ Levin improperly discounted Dr. Abney's assessment of how Plaintiff's physical pain affected his RFC because Dr. Abney is a psychiatrist, not an internist, despite the court's previous finding that Dr. Abney "was still qualified to make an opinion about how [Plaintiff's] pain affected his mental functioning and ability to work[.]" (AR 1065.) An ALJ may consider whether a physician renders an opinion "about medical issues related to his or her area of specialty[.]" 20 C.F.R. § 404.1527(c)(5); *see also Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (finding that if the ALJ assigns a treating physician's opinion less than controlling weight, "the ALJ must explicitly consider . . . whether the [treating] physician is a specialist"). Dr. Abney's status as a psychiatrist was therefore relevant insofar as he "did not conduct any physical exam of the [Plaintiff]" and did not note significant physical pain behavior in his records but instead relied on Plaintiff's self-reports. (AR 941.)

In any event, ALJ Levin did not discount Dr. Abney's opinion based solely on his status as a psychiatrist, but instead provided the following explanation:

> His findings were inconsistent with the opinions of medical doctors who were internists, as opposed to psychologists, in evaluating how the claimant's physical conditions and resultant pain might affect his work functionality. Further, his opinion as to the claimant's functionality is not supported by the limited physical treatment the claimant has required for his back, knee, and carpal tunnel conditions since 2011, or the benign objective medical findings in his clinical exams, but rather apparently on the claimant's pain symptoms.

*Id.*

Because ALJ Levin properly found that Dr. Abney's expertise was as a psychiatrist and further properly found that there was a lack of objective evidence supporting his opinions regarding Plaintiff's physical limitations, there was no error and

no violation of the remand Order even if the remanding court might have reached a different conclusion. *See McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

Finally, in explaining why Dr. Abney's RFC assessment received little weight in his analysis, ALJ Levin concluded that Dr. Abney's opinion was not supported by his own treatment notes and other evidence in the record. Plaintiff argues that this was error because the remand Order found Dr. Abney's opinions were consistent on the whole with his own treatment notes. In so ruling, this court observed that the ALJ "emphasized treatment notes indicating improvement and ignored those showing no improvement or worsening depression." (AR 1066.) While this observation may have been accurate, it remains true that the ALJ, not this court, weighs the evidence. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").

Inconsistencies between a treating physician's treatment notes and opinions constitute good reasons for assigning that physician's opinions less than controlling weight.[2] Dr. Abney opined that Plaintiff's depression caused marked restrictions in his activities of daily living, marked difficulties with maintaining social functioning, significant-to-marked decrease in concentration, persistence, and pace, and repeated episodes of decompensation, though not requiring hospitalization. He concluded that Plaintiff was "totally disabled" without addressing any evidence to the contrary, including Plaintiff's work and social activities.[3] (AR 661.) ALJ Levin provided

---

[2] *See, e.g., Clark v. Colvin*, 2016 WL 4804088, at *4 (W.D.N.Y. Sept. 13, 2016) ("[T]he ALJ was within his discretion to decline to give controlling weight" to a treating physician's opinion that was inconsistent with her own treatment notes.); *Kirk v. Colvin*, 2014 WL 2214138, at *7 (W.D.N.Y. May 28, 2014) ("Inconsistencies between [a treating physician's] treatment notes and final opinions constitute 'good reasons' for assigning her opinions non-controlling weight."); *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 254 (N.D.N.Y. 2013) (concluding that a treating physician's opinion that "Plaintiff was limited in his ability to work . . . was inconsistent with [the physician's] own treatment notes and other evidence in the record.").

[3] For example, during an October 5, 2010 appointment, Plaintiff related that he "[h]asn't enjoyed things for 7+ years [and] hasn't enjoyed his motorcycle for 2+ years" (AR 702), but by August 10, 2016, he stated that he went for "a motor cycle ride [with] his wife" and complained that "his

examples of the inconsistencies between Dr. Abney's opinions and other evidence in the record, including Dr. Abney's own treatment notes, and provided good reasons for the weight he afforded to this treating physician's opinions. On remand, he was not required to adopt the remand Order's view of the evidence.

In summary, a treating physician's opinions is not entitled to "controlling weight" if there are "good reasons" for assigning lesser weight. 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 129; *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record[.]") (citation omitted). ALJ Levin provided "good reasons" for affording Dr. Abney's RFC opinions less than controlling weight, including Dr. Abney's lack of expertise with regard to Plaintiff's physical condition, the lack of supporting evidence for his conclusions, inconsistencies between his opinions and the record as a whole, as well as inconsistencies between his treatment records and opinions. The weight ALJ Levin attributed Dr. Abney's opinions was thus supported by substantial evidence and did not violate the remand Order.

## 2. Whether ALJ Levin Properly Assigned "Little Weight" to Dr. Tortolani's Opinions.

Plaintiff argues that ALJ Levin erred in assigning "little weight" to the opinions of Plaintiff's primary care physician, Dr. Tortolani, who has treated Plaintiff since April 1994. While an ALJ considers the length and frequency of the treatment relationship in weighing the opinion of a treating physician, he must also consider the relevant evidence

---

wife won't get him his own bike." (AR 1423.) Dr. Abney's treatment notes reflect Plaintiff's report that he was "stay[ing] busy[,]" (AR 1428), by going to the movies, holiday parties, and a wedding, driving to Niagara Falls, planning for vacation at Hilton Head, South Carolina, and engaging in activities of daily living such as painting a house and finishing a shed. Additionally, Dr. Abney's notes recorded that Plaintiff mowed lawns and completed plowing routes for his property maintenance business. Because he reviewed records from September 14, 2011 to August 10, 2016, ALJ Levin had the benefit of treatment records not available to ALJ Merrill.

used to support the opinion, and the consistency of the opinion with the physician's own treatment notes and other evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2)-(4).

In this case, Dr. Tortolani's opinion consisted of a one-sentence letter stating that he "read Dr. Huyck's report and . . . concur[red] with her assessment." (AR 897.) ALJ Levin noted that, despite Dr. Tortolani's lengthy treatment history with Plaintiff, this one-sentence opinion was not supported by any objective evidence or citation to findings in the record. The ALJ further found that Dr. Tortolani's treatment notes and other evidence in the record were inconsistent with this conclusion. For example, during a May 5, 2011 appointment with Dr. Tortolani, Plaintiff described his pain as "reasonable" and that he was "happy to be mowing today[.]" (AR 842.) Dr. Tortolani wrote that Plaintiff "[l]ooks well" and is "generally doing well." *Id.* The ALJ pointed out that Plaintiff's mental health treatment notes show that in February 2010 Plaintiff reported shoveling snow and in March 2011 he had painted a client's home. These reports were similar to a 2008 treatment note wherein Plaintiff is recorded as doing well, happy with his work, and developing a client base for his property maintenance business. Other evidence reflects Plaintiff engaging in daily activities, such as plowing, mowing lawns, painting a house, building a shed, driving to Niagara Falls, and attending social events.

Again, while more than one view of the evidence is possible, and while this court might reach a different conclusion, ALJ Levin provided "good reasons" for failing to assign controlling weight to Dr. Tortolani's one-sentence opinion. *See McDade v. Astrue*, 720 F.3d 994, 999-1000 (8th Cir. 2013) (concluding the ALJ's decision to discount the opinion of Plaintiff's treating general practitioner was appropriate because the physician's opinion was "conclusory" and "fail[ed] to explain why she reached [her] conclusion"); *see also Young v. Berryhill*, 234 F. Supp. 3d 354, 359 (D.R.I. 2017) (finding the physicians' opinions "provided little more than boilerplate rationale, which simply cannot receive substantial weight").

21

## C. Whether ALJ Levin Improperly Weighed the Opinions of Consultative Examiners and Non-Examining State Agency Consultants.

Plaintiff challenges ALJ Levin's decision to give "little weight" to the opinions of examining occupational specialist Dr. Huyck, while assigning significant weight to the opinions of examining neurologist Dr. Donaldson, psychologist Mr. Italia, and each of the non-examining State agency consultants. He argues that ALJ Levin's evidentiary determinations are not supported by substantial evidence and are inconsistent with the remand Order, which found that the previous ALJ provided "no good reason [as to] why the opinions of Drs. Farrell and Atkins are worthy of more weight than those of Drs. Huyck and Tortolani regarding [Plaintiff's] physical impairments considering that [Drs.] Farrell and Atkins had never examined [Plaintiff] and were psychological consultants who did not specialize in back issues." (AR 1067.)

"In contrast [to a treating physician's opinions], in evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (internal quotation marks omitted). "However, the ALJ should weigh a consultative examiner's opinion using the same factors used to weigh the opinion of a treating physician[.]" *Elder v. Comm'r of Soc. Sec.*, 2017 WL 1247923, at *11 (E.D.N.Y. Mar. 24, 2017).

Asserting that ALJ Levin erred in finding that Dr. Huyck's opinions were "inconsistent with the evidence of record" and therefore entitled to "little weight[,]" (AR 941), Plaintiff points out that Dr. Huyck is an occupational specialist and the consistency of her opinions with record as a whole weighs in favor of assigning greater weight to her opinions. However, Plaintiff does not dispute that ALJ Levin properly gave "little weight" to Dr. Huyck's opinion that Plaintiff's back condition met Listing 1.04 because the court's 2015 opinion found that substantial evidence supports the conclusion that Plaintiff's back impairment "did not meet or medically equal the criteria of Listing

1.04." (AR 1061.) As this erroneous conclusion provided the linchpin for Dr. Huyck's primary opinion, ALJ Levin was free to conclude that this error cast doubt on her remaining opinions as well.

After evaluating Plaintiff's RFC, Dr. Huyck opined that Plaintiff could not sustain sedentary work due, in part, to his fine motor limitations. In her 2011 RFC assessment, Dr. Huyck administered the Crawford Small Parts Test, which indicated that Plaintiff was below the first percentile in fine motor coordination, though a second test administered in 2016 showed Plaintiff had improved to the twenty-fifth percentile. Her conclusion is inconsistent with the neurological examination performed by Dr. Donaldson who found that Plaintiff's fine finger movements were good, with "[s]trength [of] 5/5 throughout" and that Plaintiff's "[p]osition specific tremor" in his hands did not interfere with his life and did not require treatment. (AR 915.) On this basis alone, ALJ Levin did not err in finding Dr. Huyck's opinion regarding Plaintiff's limitations caused by his fine motor skills was inconsistent with the evidence in the record as a whole.

Similarly, ALJ Levin's observation that Dr. Huyck had not "treated [Plainitiff] previously, and at best, . . . had limited personal knowledge of the [Plaintiff's] symptoms over a long period of time" (AR 942) and his failure to credit Dr. Huyck's expertise as an occupational specialist are not grounds for remand. Although an ALJ generally gives "more weight to the medical opinion of a source who has examined [a plaintiff] than to the medical opinion of a medical source who has not examined [a plaintiff][,]" 20 C.F.R. § 404.1527(c)(1), and considers the physician's area of specialty, ALJ Levin was not required to give Dr. Huyck's opinions controlling or even substantial weight based on the fact that she examined Plaintiff only twice between 2011 and 2016 and solely for the purpose of assessing Plaintiff's ability to perform full time work. *See Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) ("[T]he ALJ was not required to give [the physician's] opinion controlling weight" because the plaintiff was examined by the physician only twice in seven years.); *see also* 20 C.F.R. § 404.1527(a)(2) (considering a medical source based "solely on [an individual's] need to obtain a report in support of [one's] claim for disability" as a non-treating source).

Regarding consultative neurologist Dr. Donaldson, Plaintiff argues ALJ Levin erred in assigning "great weight" to her opinion that Plaintiff's "[p]osition-specific tremor" in his hands does "[not interfere] with his life and does not require treatment[.]" (AR 915.) As Plaintiff points out, Dr. Donaldson wrote that Plaintiff has "poor" fine motor skills, but this notation is found in Plaintiff's treatment history, not in Dr. Donaldson's findings. (AR 914.) Similarly, although Dr. Donaldson found Plaintiff had a non-Parkinsonian tremor of the right hand while holding the equivalent of a cell phone to his ear for a period of time, she tested for and did not find any other tremors. In her examination, Dr. Donaldson recorded Plaintiff had good fine finger movements and full strength in the use of his hands. While Plaintiff correctly observes that Dr. Donaldson only examined him on a single occasion on November 7, 2011, her conclusion that Plaintiff was minimally limited in the use of his hands is supported by objective findings as well as evidence that Plaintiff was engaging in activities of daily living requiring the use of his hands, such as plowing, lawn maintenance, painting, and driving. Accordingly, ALJ Levin did not err in giving "great weight" to Dr. Donaldson's opinion.

Plaintiff argues that the ALJ erred in relying exclusively on Dr. Donaldson's opinion in finding his CTS a non-severe impairment because substantial evidence, including Plaintiff's self-reported symptoms and objective testing, supports the conclusion that his CTS is a severe impairment. At Step Two, the ALJ determines whether a plaintiff has a severe, medically determinable impairment or combination of impairments. "An impairment . . . is not severe if it does not significantly limit [a plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a); *see also Jasinski v. Barnhart*, 341 F.3d 182, 183 (2d Cir. 2003) (stating that a "'severe impairment' . . . significantly limits [a plaintiff's] physical or mental ability to do basic work activities").

In finding Plaintiff's CTS non-severe, ALJ Levin noted Plaintiff's reports of numbness and pain in his wrists, that his left hand tested positive for CTS, and a positive Phalen's test for CTS. Nevertheless, ALJ Levin properly pointed out that the "record reflects little objective evidence of [CTS] in the past seven years[,]" finding no evidence

24

that Plaintiff sought electromyography testing, surgical procedures, or injections to manage his CTS. (AR 930.) Rather, diagnostic imaging performed on February 25, 2010 revealed "normal" wrists with carpal bones "appearing normally align[ed][,]" surrounding soft tissues "appearing normal[,]" and no arthritic processes. (AR 615.) In addition to Dr. Donaldson's examination revealing 5/5 strength in Plaintiff's hands and good fine finger movements, the record further demonstrated that Plaintiff used a computer, completed property maintenance tasks, such as lawn mowing and painting, as well as driving, without significant interference from CTS. Thus, contrary to Plaintiff's argument, ALJ Levin did not rely solely on Dr. Donaldson's opinions in finding Plaintiff's CTS a non-severe impairment.

As for the February 2010 opinion of psychologist Michael Italia, Plaintiff contends that ALJ Levin provided insufficient reasoning for giving "great weight" to the opinion of a consultative medical expert whose exam pre-dates and fails to consider Dr. Abney's treatment records. (AR 940.) Although Plaintiff claims that the ALJ overlooked Mr. Italia's findings that concentrating, carrying out instructions and coping with the work environmental stress "may be problematic" for Plaintiff (AR 612), the ALJ considered these conclusions in weighing his opinions, noting Mr. Italia's observation that "although [Plaintiff's] ability to concentrate and to remember in order to carry out instructions may be problematic, as well as his ability to cope with stressors at work, due to his psychiatric symptoms[,]" Plaintiff's reported "ability to understand instructions is likely good[.]" (AR 940.) While Mr. Italia's report pre-dates and does not consider Dr. Abney's treatment records, ALJ Levin was aware of the limits of the record Mr. Italia reviewed in rendering his opinion. Accordingly, ALJ Levin did not err in evaluating the opinions of Dr. Huyck, Dr. Donaldson, and Mr. Italia.

There is likewise no error in ALJ Levin determination that each of the non-examining State agency consultant's opinions was entitled to "great weight[.]" (AR 938.)[4] While "ALJs should not rely heavily on the findings of consultative

---

[4] As the Commissioner notes in her brief, one of the State agency consultants, Dr. Ronald Woodworth, did in fact personally examine Plaintiff on March 22, 2010.

physicians" who have not examined the patient, *Selian*, 708 F.3d at 419, "State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *Smith v. Colvin*, 17 F. Supp. 3d 260, 268 (W.D.N.Y. 2014); 20 C.F.R. § 404.1513a(b)(1). As a result, the opinions of non-examining State agency consultants "may constitute substantial evidence if they are consistent with the record as a whole." *Smith*, 17 F. Supp. 3d at 268 (internal quotation marks omitted). Indeed, provided they are supported by substantial evidence, these opinions may be accorded more weight than those of a treating physician. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (finding that the regulations "permit the opinions of non[-]examining sources to override treating sources' opinions provided they are supported by evidence in the record").

The ALJ examined each State agency consultant's opinion in detail and explained its consistency with the record as a whole. In doing so, he pointed out that "[a]lthough additional evidence had been submitted since their assessments, more recent records show no worsening of symptoms or changes in Plaintiff's impairments, instead showing stable symptoms with periodic counseling and medical management." (AR 939.) Consequently, while a consulting physician's opinions that conflict with those of a treating physician should generally "be given limited weight[,]" *Cruz*, 912 F.2d at 13, this is not required where, as here, an ALJ provides "good reasons" for declining to give a treating physician's opinions controlling weight.[5]

## D. Whether ALJ Levin Erred in Determining Plaintiff's RFC.

In evaluating Plaintiff's RFC, ALJ Levin concluded that Plaintiff could perform light work, "except with the ability to stand/walk for up to 2 hours and sit for 6 hours in an 8-hour workday." (AR 933.) Plaintiff disputes this RFC, arguing that substantial evidence demonstrates he could not sustain an eight-hour work day at any exertional

---

[5] Plaintiff's claim that ALJ Levin erred in relying on Dr. Knisely's physical RFC assessment because that assessment selectively cited portions of Plaintiff's Function Report is misplaced. The only selective citation was for the purpose of highlighting Plaintiff's conflicting claims regarding the extent to which his CTS "makes using mowers impossible[.]" (AR 695.)

level due to increased pain with sustained activity and had an inability to sit for extended periods of time. He further contends that the RFC did not reflect his limitations in fine motor skills as supported by the record.

"RFC" is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1545(a)(1) ("[A claimant's] [RFC] is the most [a claimant] can still do despite [his or her] limitations."); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("RFC is not the least an individual can do despite his or her limitations or restrictions, but the most.") (emphasis omitted). Pursuant to Social Security Ruling 96-8p, "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[,]" which "means 8 hours a day, for 5 days a week, or an equivalent work schedule." 1996 WL 374184, at *1. An RFC assessment requires consideration of "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id.*

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis[.]" *Cichocki*, 729 F.3d at 176 (internal quotation marks omitted). "A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [an individual's] ability to do past work and other work." 20 C.F.R. § 404.1545(b). An individual's RFC is "based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1).

Plaintiff argues that ALJ Levin's RFC determination that he can sit for six hours in an eight-hour workday is contradicted by almost all other evidence in the record. Plaintiff points to Dr. Huyck's 2011 RFC testing, which indicated a sitting tolerance of

thirty minutes, and Plaintiff's testimony in the first hearing that he could not work in real estate because he had "a hard time sitting as many as 2 hours." (AR 76.)

However, "[i]f there is substantial evidence to support the [the ALJ's] determination, it must be upheld." *Selian*, 708 F.3d at 417. This remains true even if there is substantial evidence in support of a contrary conclusion. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (stating that a district court's review "is limited to determining whether the *SSA's conclusions* were supported by substantial evidence in the record") (emphasis supplied). While Plaintiff marshals evidence suggesting a more severe sitting restriction than found by ALJ Levin, there is substantial evidence in the record as a whole to support the ALJ's determination. Drs. Runge and Knightly both found that Plaintiff could sit for six hours in an eight-hour workday. During the 2011 hearing, Plaintiff acknowledged that he spent four-hour shifts in a real estate office. Although Plaintiff reported that he discontinued his real estate work due to pain from prolonged sitting, Plaintiff testified that he was capable of sitting in his truck and operating a snow plow for three-and-a-half to four hours at a time. Plaintiff further reported social activities, including attending a wedding, visiting friends for holiday parties, going to the movies, and driving to Niagara Falls for vacation, all of which presumably involved extended sitting.

Although a close question, because ALJ Levin's conclusion that Plaintiff could sit for six hours in an eight-hour day is supported by substantial evidence, the court cannot remand merely because it might reach a different conclusion. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").

Plaintiff's argument that his RFC should reflect limitations in his fine motor skills caused by his CTS fares no better. ALJ Levin properly relied on Dr. Donaldson's report that Plaintiff's was minimally limited in the use of his hands in concluding Plaintiff's CTS was a "nonsevere" impairment. As the ALJ pointed out, a September 2011 neurological exam revealed "mostly normal findings with 'very calloused' hands, normal

28

tone, full 5/5 strength through, good fine finger movement, intact light touch in all extremities, and stable gait, including tandem, heels and toes[.]" (AR 935-36) This conclusion was further supported a lack of objective findings on Plaintiff's CTS from the last seven years together with reports of Plaintiff engaging in activities of daily living requiring the use of his hands, including household chores such as emptying the top rack of the dishwasher, grocery shopping, driving, "playing cards [and] board games with [his] family[,]" and work related activities, such as mowing. (AR 441.)

## E. Whether ALJ Levin Erred in Finding Plaintiff's Alleged Symptoms Inconsistent with Evidence in the Record.

ALJ Levin concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence in the record. Plaintiff contends this conclusion is flawed because the ALJ (1) found Plaintiff had "minimal treatment in the past 3 or 4 years" to alleviate his back pain even though Plaintiff had exhausted his treatment options for his chronic pain (AR 935), (2) extrapolated "one-time maximums" from functional testing over an eight-hour workday (AR 1412), and (3) cited Plaintiff's 2011 hearing testimony that he could work in real estate for four-hour periods despite evidence that he could no longer do so.

When considering a claimant's subjective reports of pain and limitations in determining RFC, an ALJ conducts a "two-step" analysis. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ determines "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (internal quotations omitted) (alterations in original). Second, the ALJ must consider: (1) the claimant's "daily activities"; (2) the "location, duration, frequency, and intensity" of pain; (3) factors that precipitate and aggravate the symptoms; (4) the "type, dosage, effectiveness, and side effects of any medication" the claimant takes or has taken to alleviate the pain or other symptoms; (5) other treatment;

29

(6) any measures taken to relieve pain; (7) and any other relevant factor. 20 C.F.R. § 404.1529(c)(3)(i)-(vii). The ALJ's reasons for discounting a claimant's subjective complaints "must be set forth with sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (internal quotation marks omitted).

Plaintiff properly notes that his lack of treatment in the last three to four years for his back pain does not mean that his pain is not disabling when there is evidence that he had exhausted his treatment options. *See* AR 885 (Dr. Huyck opined that "[g]iven the extensiveness of his treatment and given that he has exhausted conservative care, [Plaintiff] is not expected to improve in any significant way in the next 12 months, and in fact, this is a chronic condition."); AR 1066 (The court found that "the record reflects that [Plaintiff] had exhausted his treatment options[,] . . . particularly regarding his back pain, and was still left with chronic pain which was unlikely to lessen or go away."). Nonetheless, Plaintiff's claims of disabling back pain are not wholly consistent with either his reported activities or Dr. Woodworth's consultative exam which revealed close to normal range of motion in Plaintiff's spine and only mild pain while bending and extending. Dr. Tortolani's treatment records also note that Plaintiff's pain was "reasonable" and that taking ibuprofen and Aleve "seem[ed] to help." (AR 842.) Plaintiff himself reported significant improvement after the FRP, describing his pain as "mild" and "stable" with the "related disability . . . as nil." (AR 820.) While Plaintiff's ability to lift up to thirty-eight pounds, carry up to forty-three pounds, and climb fifty-eight stairs may have been "one-time maximums," these functional test results are relevant to the ALJ's determination that Plaintiff's significantly more limiting symptoms were not fully supported by the record.

Similarly, ALJ Levin did not err in citing Plaintiff's testimony regarding his real estate work to support a finding that Plaintiff's self-report as to the extent of his work activity was not fully consistent. Although Plaintiff testified that he abandoned his real estate work due to the pain caused by sitting for more than two hours, he stated in his 2010 Function Report that he was still "working as a real estate agent[] and would tour

homes for sale with customers[]" and that he worked from an office several hours at a time. (AR 937.) He also acknowledged that he could sit and drive a truck for up to four hours while operating a snow plow for his property maintenance business. As further support for his conclusion that Plaintiff's report of his work activity was not reliable, ALJ Levin cited Plaintiff's September 2013 statement to Dr. Abney that he hoped to obtain a "settlement" from SSA to help his children pay off debt (AR 1434). *See Ramirez v. Barnhart*, 292 F.3d 576, 582 n.4 (8th Cir. 2002) ("[A]n ALJ may consider a claimant's financial motivation to qualify for benefits while assessing the credibility of a claimant's subjective pain complaints[.]").

Because substantial evidence supports the ALJ's conclusion that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his pain were not entirely consistent with the evidence in the record, there is no basis for a remand. *See Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor."); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]").

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion to reverse and remand for a calculation of benefits (Doc. 5) and GRANTS the Commissioner's motion to affirm (Doc. 6).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 21st day of February, 2018.

Christina Reiss, District Judge
United States District Court

31